Carolyn **BRADLEY** et al.

v.

**SCHOOL BOARD OF the CITY OF RICHMOND, VIRGINIA, et al.**

Civ. A. No. 3353.

United States District Court,
E. D. Virginia,
Richmond Division.

Jan. 29, 1971.

See also 324 F.Supp. 439; 51 F.R.D. 139.

Norman J. Chachkin, New York City, Louis R. Lucas, Memphis, Tenn., M. Ralph Page, James R. Olphin, Richmond, Va., for plaintiffs.

George B. Little, John H. O'Brion, Jr., James K. Cluverius, Richmond, Va., for defendants. Superintendent of Schools and School Board of the City of Richmond.

Andrew P. Miller, Atty. Gen. of Virginia, William G. Broaddus and D. Patrick Lacy, Jr., Asst. Attys. Gen., for defendants State Board of Education and Superintendent of Public Instruction.

Robert D. McIlwaine, III, Petersburg, Va.; J. Mercer White, Jr., County Atty., for Henrico County, L. Paul Byrne, Richmond, Va., for defendants School Board and Board of Supervisors of Henrico County.

J. Segar Gravatt, Blackstone, Va., for defendant School Board of Chesterfield County.

Oliver D. Rudy, Commonwealth's Atty., for Chesterfield County, Frederick T. Gray, Walter E. Rogers, Richmond, Va., for Board of Supervisors of Chesterfield County.

Everette G. Allen, Jr., Richmond, Va., for Intervenors Bellevue-Ginter Area Civic Ass'n, Robert Douglas Bain, and Sherwood Park Civic Ass'n.

Frederick T. Gray, Walter E. Rogers, Richmond, Va., for intervenors Noel Austin and others.

John S. Battle, Jr., William H. King, Jr., Richmond, Va., for intervenors Westover Hills Parent-Teachers Ass'n.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiffs in this class action, the Richmond school desegregation matter, have moved the Court to direct the city school board to put into effect for the second semester of the 1970–71 school year the plan for school operations offered by plaintiffs in hearings conducted prior to the opening of school in 1970. This has been referred to as the Foster plan because it was prepared under the direction of Dr. Gordon Foster. It is the plaintiffs' position that the Foster plan is the only plan currently before the Court under which the defendants could satisfy their constitutional duty to operate a unitary school system, and that therefore the Court has a duty to order its implementation.

In its opinion of August 17, 1970, Bradley v. School Board of City of Richmond, 317 F.Supp. 555 (E.D.Va.1970), this Court declined to order the implementation of the Foster plan, but instead consented to the system's operation under a plan formulated by the defendants. The Court so ruled, briefly, because the plaintiffs' plan of pupil assignment, if put into effect in a manner calculated to be not unreasonably disruptive to the system, would require the acquisition of additional transportation facilities not then available. *Id.* 571. In the same opinion the Court stated that the defendants' plan was approved as an interim measure only and that the Foster plan would achieve a legally unitary system by means considered reasonable under applicable precedents.

Nonetheless the Court will not order further measures to desegregate Richmond schools during the second semester.

Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969), holds that "the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools," *Id.* 20, 90 S.Ct. at 29, 24 L.Ed.2d 19. See also, Nesbit v. Statesville City Board of Education, 418 F.2d 1040 (4th Cir. 1969): "Further delays will not be tolerated in this circuit. No school district may continue to operate a dual system based on race. Each must function as a unitary system within which no person is to be excluded from any school on the basis of race." *Id.,* 1042.

In Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970), the Supreme Court reversed an appellate ruling permitting postponement of the application of unitary student attendance plans from February 1970 until the beginning of the fall term that year. The Fifth Circuit had authorized deferral because in some cases unitary attendance plans did not exist, and because buildings had to be put to new uses, transfers of equipment and libraries had to be executed, and bus routes had to be rearranged. Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211, 1217 (5th Cir. 1969). The Supreme Court held that "[i]nsofar as the Court of Appeals authorized deferral of student desegregation beyond February 1, 1970, that court misconstrued our holding in Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, [24 L.Ed.2d 19.]" Carter v. West Feliciana Parish School Board, *supra,* 291, 90 S.Ct. 608. Involved in the consolidated proceeding was at least one large municipal system, that of Mobile, Alabama.

Mr. Justice Harlan's separate opinion sought to interpret the Court's immediacy requirement:

Alexander makes clear that any [desegregation] order so approved should thereafter be implemented in the minimum time necessary for accomplishing whatever physical steps are required to permit transfers of students and personnel or other changes that may be necessary to effectuate the required relief. *Id.,* 293, 90 S.Ct. 609.

Following *Carter,* the Fourth Circuit rejected applications for delay until September, 1970, in Stanley v. Darlington County School District, 424 F.2d 195 (4th Cir. 1970). Recognizing the possibility of substantial disruption and damage to the educational process, the court nevertheless held that, under *Carter,* immediate desegregation was required despite that no vacation interval was available for purposes of executing reorganization. The argument that the principle of *Alexander* and *Carter* was not of general application was also rejected. One of the school systems at bar in *Stanley* served 58,000 pupils.

In Northcross v. Board of Education of Memphis, Tennessee, City Schools, 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970), which involved a sizeable municipal school system, the Court reversed an appellate holding that *Alexander* had no application to the case. An order of remand was modified with the direction to the district court to consider and decide the case consistently with *Alexander's* timetable.

Subsequently the Supreme Court agreed to hear certain cases concerning in particular the efforts required of urban school officials in creating a constitutionally unitary school system. Swann v. Charlotte-Mecklenburg Board of Education, cert. granted, 399 U.S. 926, 90 S.Ct. 2247, 26 L.Ed.2d 791 (1970); Charlotte-Mecklenburg Board of Education v. Swann, cert. granted, 400 U.S. 805, 91 S.Ct. 10, 27 L.Ed.2d 35 (Oct. 6, 1970); Moore v. Charlotte-Mecklenburg Board of Education, juris. question postponed, 400 U.S. 803, 91 S.Ct. 11, 27 L.Ed.2d 34 (Oct. 6, 1970); North Carolina Board of Education v. Swann, prob. juris. noted, 400 U.S. 804, 91 S.Ct. 11, 27 L.Ed.2d 34 (Oct. 6, 1970); McDaniel v. Barresi, cert. granted, 400 U.S. 804, 91 S.Ct. 10, 27 L.Ed.2d 35 (Oct. 6, 1970); Davis v. Mobile County Board of School Commissioners, cert. granted,

400 U.S. 804, 91 S.Ct. 11, 27 L.Ed.2d 43 (Oct. 6, 1970). These cases were argued at length in October, and a decision has not yet been rendered.

Richmond even now could not adopt the Foster desegregation scheme without substantial distortion of the educational process, because in the months intervening since this Court's ruling of August 17, 1970, the defendant city school board has not undertaken to purchase facilities required for transportation, and the evidence indicates that approximately ninety days are required before delivery of such equipment.

The order of August 17, directed the city school board and council to report to the Court within ninety days all steps taken to achieve integration and the earliest practical and reasonable date at which a unitary system could be put into effect. The Court did not direct in August that the plaintiffs' plan be put into effect as soon as possible, nor that the school board make necessary preparations to institute a unitary system under the Foster plan, or one of their own invention, commencing in January, 1971. Compare Carter v. West Feliciana Parish School Board, 396 U.S. 226, 90 S.Ct. 467, 24 L.Ed.2d 382 (1969).

■ In this the Court was guided by the standard of reasonableness laid down in Swann v. Charlotte-Mecklenburg Board of Education, 431 F.2d 135 (4th Cir. 1970), a decision handed down subsequent to the three Supreme Court rulings mentioned. Postponement of final desegregation at least until buses can be acquired can be justified as allowing only "the minimum time necessary for accomplishing whatever physical steps are required to permit transfers of students," Carter v. West Feliciana Parish School Board, 396 U.S. 290, 293, 90 S.Ct. 608, 609, 24 L.Ed.2d 477 (1970) (Harlan, J., concurring). Postponement of *steps to acquire the means to accomplish* what the law currently requires is, however, supported and compelled only by the Swann standard of reasonableness. The Court concluded in August and still believes that the fact that foreseeably

significant cases are pending at the highest appellate level is a circumstance that may be considered in determining whether a school board has been ordered to make every reasonable effort to eradicate the vestiges of segregation.

■ The report from the school board, supplemented by three proposed plans for the operation of the system, is now in the record. The board states therein that "the implementation of any significant changes in the present plan during this school year would produce irreparable damage to the public school system." The only difficulties mentioned, however, are problems of management and supply and consequential effects upon the educational process. Under Stanley v. Darlington County School District, *supra,* and *Carter* itself, these are no grounds for delay in issuing an implementation order. Want of transportation facilities might justify a decision not to put the Foster plan into effect forthwith, but it would not support a denial of further relief of some limited sort.

■ Nevertheless the Court shall permit further postponement. Such action is compelled by the same reasons which led the Court to enter no order in August requiring further steps by the board beyond the implementation of the interim plan. The prospect of a semester's delay in integration, balanced against the possibility that forthcoming rulings might alter current law so that substantial effort and expense, now required to achieve a unitary system, might later be seen to have been spent needlessly, leads the Court to decide that immediate reorganization of the Richmond system would be "unreasonable" under *Swann.* This is not to say, however, that the likelihood of any more than one semester's further delay could be supported by considerations of avoiding possible waste in money and educational benefits.

This Court does not stand alone in electing to withhold relief.

The Supreme Court itself, despite its trilogy of per curiam decisions rejecting delay, has held the *Swann* and *Davis*

cases under advisement for more than three months at this date. Stays have been denied, to be sure, in those and other cases. But an examination of the reports of the lower appellate courts cannot but betray to the Justices a growing inclination to postpone judgment, and therefore relief, until the issues argued in Washington last October are resolved.

The Fourth Circuit has decided only one case involving a system's desegregation in pupil assignment since the *Swann* and *Davis* cases were submitted, Allen v. Asheville City Board of Education, 434 F.2d 902 (4th Cir. 1970), and that case in reality concerned only a dispute over the closing of two all-black schools.

More importantly, while our court of appeals denied the application for a stay in this case made by some of the defendants, it likewise denied the plaintiffs' motion for an injunction requiring the implementation of the Foster plan pending appeal, despite this Court's ruling that that plan was a reasonable means to achieve final desegregation. Furthermore an appellate briefing schedule has been established contingent upon the Supreme Court's rulings in *Swann* and *Davis*.

The Fifth Circuit, which shares with our circuit the bulk of school desegregation cases at present, has issued no rulings since the submission of the cases now on appeal and certiorari. A preliminary tabulation reveals that in April, 1970, that court delivered six opinions concerning systemwide school desegregation. In May two were rendered, in June three; in July eleven. In August twenty-two major and minor opinions issued. In September only one decision on pupil desegregation was rendered. Since that date no opinions by that court concerning the extent of a school board's duty to integrate student bodies have come to this Court's attention.

Since October the Eighth Circuit has delivered only one school desegregation opinion, to this Court's knowledge, and that was a per curiam affirmance of a case involving peculiar facts, one on which *Swann* and *Davis* might be expected to be of little guidance.

The Tenth Circuit has issued no decisions on desegregation of schools since July.

The Sixth Circuit has not been so inactive. Other than a case concerning a legislative enactment annulling a school board's voluntary efforts to desegregate and one concerning new construction in the desegregation context, it rendered one opinion relevant to the issue at hand. In Kelley v. Metropolitan County Board of Education of Nashville and Davidson County, 436 F.2d 856 (6th Cir. 1970), that court of appeals vacated a district court order staying all proceedings until opinions issued in the school cases now under advisement in the Supreme Court. Relying on Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Alexander, Carter,* and the interim orders in Swann v. Charlotte-Mecklenburg Board of Education, 399 U.S. 926, 90 S.Ct. 2247, 26 L.Ed.2d 791 (1970) and Carter v. West Feliciana Parish School Board, 396 U.S. 226, 90 S.Ct. 467, 24 L.Ed.2d 382 (1969), the court held that a refusal to consider proposed plans and order adoption of one which would achieve a unitary system was improper.

We are profoundly aware of the potential impact of the decisions anticipated in the cases cited above. But we believe the Supreme Court has plainly told us *not* to suspend efforts to disestablish racially separate school systems and to eliminate racial segregation "root and branch" while awaiting decision on the ultimate question of to what degree such efforts must include racial balance in school districts.

\*    \*    \*    \*    \*    \*

It is clear to us that the rights of school children to schooling under nondiscriminatory and constitutional conditions cannot be recaptured for any school semester lived under discriminatory practices. Kelley v. Board of Education of Nashville and Davidson

County, *supra*, 436 F.2d at 856, 857, 862.

On its facts the case is not inconsistent with an inclination to withhold immediate relief, however, for the case concerned a stay not of implementation of a decree but of proceedings leading thereto. Moreover, it may be that the system in question could be desegregated at no substantial additional expense. Nonetheless the case is notable for its implicit rejection, on the strength of *Alexander* and its progeny, of judicial and administrative economy as justifications for delay.

*Kelley* is unique, however. Other circuits, and in particular our own, apparently regard the cost of delay for the moment at least as outweighed by the possible cost of first one drastic overhaul of a school system, followed by a second, occasioned by intervening Supreme Court rulings. It may be difficult for some to conceive how much more categorically the Supreme Court could have removed administrative expense and disruption from the class of relevant factors than it has done already. But acts speak louder than dicta.

This Court concludes that, under principles viable in this circuit and most others, it would be unreasonable and therefore unlawful to direct the defendants to implement the Foster plan during the second semester.

### ON MOTION TO VACATE OR MODIFY INJUNCTION

Since June 20, 1970, the defendant School Board of the City of Richmond has been under this Court's order to refrain from further school construction during the pendency of this litigation. This was entered by the Court on the plaintiffs' motion for the reason that major physical changes in the system will have an enduring impact on the range of alternative pupil assignment plans, with consequent effect on the feasibility of future desegregation. See, Sloan v. Tenth School District of Wilson County, 433 F.2d 587 (6th Cir. 1970); Calhoun v. Cook, 430 F.2d 1174 (5th Cir. 1970);

United States v. Board of Education, Independent School District No. 1, Tulsa County, 429 F.2d 1253 (10th Cir. 1970); Monroe v. Board of Commissioners of Jackson County, 427 F.2d 1005 (6th Cir. 1970); Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1969), rev'd. in part sub nom. Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970); United States v. School District 151 of Cook County, 404 F.2d 1125 (7th Cir. 1968); Brewer v. School Board of City of Norfolk, 397 F.2d 37 (4th Cir. 1968); Carr v. Montgomery County Board of Education, 289 F.Supp. 647, 659–660 (M.D.Ala.1968), aff'd. sub nom. United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969). "The continued use of less efficient remedies such as bussing and majority to minority transfers could be avoided in the future by the judicious placement of needed new schools at locations which maximize the inclusion of students of both races within the normal attendance zones formed around those locations." United States v. Board of Education, Independent School District No. 1, Tulsa County, *supra*, 429 F.2d 1259–1260.

At the time that order was entered the city was not operating a constitutionally unitary school system. It is still not doing so. This Court permitted the schools to open under an interim plan proposed by the school board because the sole constitutionally satisfactory plan— that offered by the plaintiffs—could only be instituted at the cost of unreasonable disruption of the system, and by means of the purchase of additional buses not then available. Bradley v. School Board of City of Richmond, 317 F.Supp. 555 (E.D.Va.1970).

Since that time, as required by the Court's order of August 17, 1970, the city school board has presented additional proposed plans for the eventual desegregation of the system. Without prejudging the merits of the three proposals, the Court can say that these

**462**

plans reflect an appreciation of the physical and human resources which may be required in this task.

On December 4, 1970, the Court, in response to the city school board's motion to vacate or modify the construction injunction, invited the parties to present the issue on briefs and the depositions of witnesses. This is the question now before the Court.

Prior to the school board's motion, the parties informed the Court by letter of October 29, 1970, that an agreement had been reached such that the plaintiffs would make no objection to the board's proceeding with certain construction projects. Furthermore, it appears that certain other construction plans are not now matters of high priority.

The only projects which currently are held up, apparently, by reason of the June 20th injunction, are two elementary schools of 900 pupil capacity to be built in the newly annexed area of Richmond and a third proposal for an elementary school to accommodate 750 pupils on a site on Dove Street in the city's northside.

Defendants contend that they have made the showing required by the opinion of June 20:

> Upon a showing by the defendants, prior to the final approval by the Court of a school plan, that any particular project will not in fact and law have the effect of perpetuating racial segregation, leave to proceed will be granted.

■ The Court must rule on the pending motion without the benefit of decisions by the Supreme Court in Swann v. Charlotte-Mecklenburg Board of Education, cert. granted, 399 U.S. 926, 90 S.Ct. 2247, 26 L.Ed.2d 791 (June 23, 1970); Davis v. Mobile County Board of School Commissioners, cert. granted, 400 U.S. 804, 91 S.Ct. 11, 27 L.Ed.2d 43 (Oct. 6, 1970); and other school cases now before the Court. This Court will not speculate as to the guidance, if any, that rulings in those cases might afford in the solution of the present problems. The law prevailing in this circuit is that new school construction can only be approved if, after a consideration of alternative sites and assignment plans, it appears that the project will eradicate rather than entrench racial segregation. Felder v. Harnett County Board of Education, 409 F.2d 1070, 1074 (4th Cir. 1969); Brewer v. School Board of City of Norfolk, *supra.*

The Court will adhere to that standard. It should be noted, however, that it has been the school board's position at numerous stages of this case that further action to desegregate the schools should be deferred until *Swann* and *Davis* are decided. On the present issue they do not request such abstention. They must be on notice, however, that when they move for leave to proceed with construction, and when the Court rules, all assume the risk that any costs incurred in reliance on a district court ruling may be shown by an intervening interpretation of the law to have been expended in error.

In its consideration of the deposition testimony, the Court has proceeded on the premise that the board's estimation of its needs for further capacity, while far from beyond inquiry, is worthy of substantial deference for the reason that public officials presumably do not ordinarily spend money needlessly. It is primarily the question of location of new facilities that occupies the Court. As in the case of zone lines, the rule in expansion of facilities is that "The board's rejection of alternatives suggested by the court [or by parties] that would lead to less segregation * * * [raises] an inference of discrimination that [requires] the board to justify its conduct by clear and convincing evidence." Brewer v. School Board of City of Norfolk, *supra,* 397 F.2d 41.

Concerning capacity needs, Dr. Thomas Little, Associate Superintendent of Schools, testified that confining consideration to the newly annexed area of southside Richmond, and looking to September of 1972, present elementary school capacity would fall 1275 spaces short of needs if a kindergarten through

sixth grade (K–6) pattern were employed, and 1479 spaces short if elementary schools housed kindergarten through fifth grade classes (K–5). These figures are based upon 90% utilization of classroom spaces, a standard which has been used by Richmond for some years in an effort to reduce class sizes. The shortage is greater under a K–5 plan because of the need to put one former elementary unit to use as a middle school.

While it is in one respect artificial to confine discussion to the annexed area in testing capacity needs, the technique is not entirely invalid. For, looking forward either to a geographic zoning plan or to a plan incorporating pairing and cross-busing, the school board proceeded on the premise that it would be desirable to locate the schools so that either half of the pupils or all of them could be within walking or short transportation distance of school (D. 55). Even though the evidence in earlier proceedings has been that elementary children must be bused to school in any event in the annexed area for safety reasons, it is understandable that the board should wish to keep the routes as short as possible.

The sites were re-evaluated by the board, Dr. Little testified, in the light of the Court's opinion of June 20, to test their compatibility with various possible plans of desegregation. The defendants concluded that the proposed locations would not serve to perpetuate segregation under three possible legal standards fixing the duty of school officials: basic geographic zoning with contiguous pairing, noncontiguous pairing, and a metropolitan system incorporating the adjoining counties.

Alternative sites were considered and rejected, Dr. Little said. The board thought that based on the historical development of racial housing patterns in Richmond, schools located closer to the core of the city than the proposed sites in the annexed area would predictably be in all-black neighborhoods in a fairly short time (D. 25). Site cost and the desirability of placing schools in less densely settled areas were also considerations.

The two proposed annexed area elementary schools, one on Jahnke Road and another on Walmsley Boulevard, are in principally white areas; the Dove Street site is in a mainly black area.

While considering the locations valid under either a plan limited to contiguous pairing or one incorporating cross-busing, Dr. Little conceded that the locations might be questionable were the law to require in the future transportation only up to a certain distance, or were the law to accept racial imbalances concomitant with contiguous zoning of existing schools but require that any new facilities reflect the system's overall ratio. (D. 55–58). At the same time, Dr. Little stated that he favored, as an expert, noncontiguous pairing and cross-busing as the best means to accomplish substantial desegregation of elementary classes, and that the locations selected would not impede such a plan (D. 83–84).

The plaintiffs' expert, Dr. Gordon Foster, testified that at one time he opposed the Jahnke Road elementary school project in the annexed area on account of lack of need for further capacity. Since then, he received detailed figures concerning the number of elementary level pupils residing in the annexed area but attending school temporarily in Chesterfield County. These come to 1192, and 1387 if sixth grade is included. If the board's 27-pupil classroom standard is adhered to, the system might well have an overall shortage when they return to the city system (D. 129).

Passing questions of capacity, Dr. Foster stated that the Jahnke Road site would result in a nearly all-white school if contiguous zones were used (D. 99). Noncontiguous pairing, usually a more expensive technique, would of necessity be with a zone north of the James River, but the witness did not consider this site disadvantageous if such a scheme were used. (D. 100). If the school could not be paired with a site

north of the James, however, a segregated school would result.

The Walmsley Boulevard site would also contain an all-white school under contiguous zoning (D. 102). To pair it with a non-contiguous zone across the river, within or without a metropolitan plan, would entail substantial transportation, however.

The plaintiffs' expert preferred the Jahnke Road location to that on Walmsley Boulevard in the context of a pairing and cross-busing plan because of its accessibility to the black populations on both sides of the James. Still he would advocate seeking a location for the proposed Jahnke Road school further to the east, where "depending on population movements, which are not always clear, there might be no need for transportation." (D. 125). Assuming a plan incorporating cross-busing, however, he said a difference of about a mile in transportation distance would not be very material. (D. 127).

Dr. Foster said that the Dove Street school proposal would, under a contiguous zoning plan, result in a mainly black school. On a metropolitan plan, the location would not be unsuitable so long as integration by noncontiguous pairing was available. The witness did not give his opinion of the site as part of a citywide system employing cross-busing. He could not suggest a better site to replace the aging Highland Park School, but admitted that, in counsel's words, he did not "have the advantage of the exploration of possible sites that has been going on by the Planning Commission of the City and the School Board for a number of years * * *" (D. 121).

Generally speaking, the witness would have preferred that "every avenue be exhausted in search of a site which would be more equi-distant to the white and black population." (D. 119). For example, one "buffer" zone where a school replacing the Bowler and Mason facilities could be built without entrenching segregation, he testified in answer to a hypothetical question, is located a mile south of the river near the Oak Grove School.

He did not contest the sites chosen as valid "neighborhood" schools (D. 123), and he conceded that if integration of each elementary facility is required by the law, this can only be achieved throughout Richmond by noncontiguous pairing and cross-busing (D. 124).

The difficulty with the approach which the defendants have apparently undertaken in reviewing their site selections to determine whether the choices promote or impede legally required desegregation is that they have proceeded on the basis of hypothetical legal standards rather than what the law currently requires.

The law of this circuit governing the desegregation in general of large city school systems has been set forth in more than one recent ruling:

> The school board in devising its plan and the district court in considering whether or not it is adequate must explore every reasonable method of desegregation, including rezoning, pairing, grouping, school consolidation, and transportation, including a majority to minority transfer plan. In short, any and all reasonable means to dismantle the dual system and eliminate racial characteristics in the Roanoke schools must be utilized, so that "no person is to be effectively excluded from any school because of race or color." Alexander v. Holmes Co. Bd. of Ed., 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). Green v. School Board of City of Roanoke, 428 F.2d 811, 812 (4th Cir. 1970).

> First, * * * not every school in a unitary school system need be integrated; second, nevertheless, school boards must use all reasonable means to integrate the schools in their jurisdiction; and third, if black residential areas are so large that not all schools can be integrated by using reasonable means, school boards must take further steps to assure that pupils are not excluded from integrated schools

on the basis of race. Special classes, functions, and programs on an integrated basis should be made available to pupils in the black schools. The board should freely allow majority to minority transfers and provide transportation by bus or common carrier so individual students can leave the black schools. And pupils who are assigned to black schools for a portion of their school careers should be assigned to integrated schools as they progress from one school to another. Swann v. Charlotte-Mecklenburg Board of Education, *supra*, 431 F.2d 138, 142.

The very case which gave birth to the rule of reasonableness, moreover, partially relied in its conclusion of de jure segregation on a finding that "The school board, for its part, located schools in black residential areas and fixed the size of the schools to accommodate the needs of immediate neighborhoods." Id. 141. Courts in this circuit must consider the potential which site and capacity decisions for facilities built today have for the creation of segregated conditions which may in years to come be very difficult to alleviate.

Prevailing standards setting a school board's duty to integrate seem to depend to a great extent on the characteristics of the system in issue and thus lack the precise simplicity of the legal rules which the city board hypothesized. In *Swann*, for example, the Fourth Circuit approved the district court's rejection of a "drastically gerrymandered" contiguous zoning system for elementary students because about half the students of each race were left in nearly completely segregated schools—the plan was ineffective. At the same time the Court of Appeals rejected a proposal incorporating pairing and cross-busing for reasons relating to expense in time and money— the plan was unreasonable. Still the same court chastized the school board for failing to consider "such legitimate techniques as pairing, grouping, clustering, and satellite zoning," Id. 146, and specifically endorsed bus transportation as a "permissible tool," Id., 145. Yet

again the court held that each separate school facility need not be integrated at all cost.

It is in the light of this guidance as to the measure of the defendant school board's duty that these new projects must be measured. It must be kept in mind, too, that the defendant board's current proposals are for structures only; they do not represent that, absent the compulsion of a court order, they intend to initiate a transportation program to integrate the new schools as they open. Indeed in open court counsel for the city board stated that, if permitted, they would elect to operate under a neighborhood zoning system for understandable reasons of economy. Moreover, in view of defendants' professed needs for extra capacity at the elementary level, it is unlikely that the schools, if built, could be ordered to lie idle.

Some prior rulings concerning school construction have been made in the context of free choice plans. See, e. g. Kelley v. Altheimer, Arkansas Public School District No. 22, 378 F.2d 483 (8th Cir. 1967); Lee v. Macon County Board of Education, 289 F.Supp. 975 (M.D.Ala.1968); Wright v. County School Board of Greensville County, 252 F.Supp. 378 (E.D.Va.1966). Of primary concern in such instances was the effect of a site and size choice on the individual pupil's attendance decision. While current doctrine is not restricted to such reliance upon pupil initiative to achieve integration, the powers of a court of equity are still limited by reason and practicality. If building these proposed facilities gives rise to avoidable impracticalities in desegregating them or other schools, it cannot be said that the expansion "will prevent the recurrence of the dual school structure," Singleton v. Jackson Municipal Separate School District, *supra*.

Here the plaintiffs' expert witness testified without direct contradiction that each of the three elementary school sites was in some respect lacking in its contribution to the full desegregation of the Richmond system. This is

sufficient to shift to the defendant board the "heavy burden * * * to explain its preference for an apparently less effective method," Green v. County School Board of New Kent County, 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716 (1968).

To meet this burden the defendants offered little more than bare conclusions. Testimony was that city school administrators, the State Department of Education, and the city's Department of Planning and Community Development, were requested to participate in reevaluating the proposals. To buttress the conclusion that the chosen sites were appropriate, a letter from A. Howe Todd, Director of the Department of Planning and Urban Development was introduced. It apparently makes reference to all nine construction projects which are proposed. Mr. Todd states therein that sites closer to the city's center would involve less transportation distance, but schools then would have to be in "less desirable" blighted or industrial areas. Moreover, he said, because of the lack of vacant land, costs would increase; "Acquisition, demolition and development costs of such built-up land would be at least six times greater than sites in proposed locations." Minimum site rules of the State Board also pose problems, he said.

This information was not subject to cross-examination, nor were the bases for the factual conclusions set forth.

Superintendent Adams' letter was also introduced at Dr. Little's deposition. He stated that:

> Careful consideration had been given to the original selection of these sites from the standpoint of vacant land, accessibility to community facilities, adjoining land uses, traffic hazards and other planning factors, and regardless of the action of the courts, these sites are still considered to be the best available.

This evidence, too, was not subject to elucidation by cross-examination.

The testimony of Dr. Little himself was in the main conclusory as well. Other general locations for the annexed area schools were considered, he said, and those closer to the core were thought prohibitively expensive and lacking in amenity. The details of the investigations made of alternative locations from the standpoint of the racial composition, site and building costs, and factors such as the most feasible way to pair the schools, if necessary, and whether one location, under a cross-busing plan, would require the purchase of less buses than another, are not now before the Court.

The testimony of the plaintiffs' expert is that the planned Jahnke Road school might, if sited further east, be desegregated without the use of transportation, and that the Walmsley Boulevard school site cannot be paired without substantial transportation, which would perhaps prohibit the use of certain buses for more than one trip each morning. Likewise it is uncontradicted that the Dove Street school is not now needed for reasons of lack of capacity, but is conceived as a replacement for the Highland Park School. (D. 24). It is anticipated to be predominantly black if run on a neighborhood zoning basis; in other words, it too could not be desegregated without the use of transportation.

The school board on this evidence has not sustained its burden of demonstrating that, of all reasonable alternatives, the proposed new construction, in site and capacity choices, will best serve "the objective of eradicating the vestiges of the dual system," United States v. Jefferson County Board of Education, 380 F.2d 385 (5th Cir.), cert. denied, Board of Education of City of Bessemer v. United States, 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967), and that the new schools will not be "located to perpetuate segregation," Brewer v. School Board of City of Norfolk, supra. Nor have the proposals been justified on the alternative ground that, although schools in other places or of different capacity might contribute more to integration,

they would be unreasonably expensive to erect, or the costs of alternatives would outweigh the expense of transportation to desegregate the schools now planned. The language of a recent Fifth Circuit decision fits this case:

> The conclusory expression of opinion by the superintendent of schools that in his judgment the location of this school, long since planned, without reference to the requirements of Jefferson, would meet those requirements, cannot substitute for the absence of a planning study and analysis made *in such manner as to be subject to review by the district court* that is required under the Jefferson ruling. United States v. Board of Public Instruction of Polk County, Fla., 395 F.2d 66, 70 (5th Cir. 1968) (emphasis supplied).

Effective review requires that the bases for administrators' conclusions be supplied. It may be that exhaustive analyses of the cost of building schools elsewhere and of different capacity were made and that the expense of ensuring a desegregated student body at various places has been determined. If such studies were made, the Court has not seen them.

All agree that desegregation of each school is possible. There is even consensus on the most practical technique: pairing and cross-busing. Whether that technique can be applied to these schools is not the question. It can.

But once these facilities are constructed, it will not necessarily be the defendants' duty to desegregate them whatever the cost. The plaintiffs' relief will be limited by the feasibility of, and expense involved in, providing an integrated education for given proportions of the student body in various numbers of schools. Conversely, to say, as the law does, that all the schools in any given system need not be integrated does not mean that there is no duty to undertake all reasonable measures to that end, which sometimes will be attainable.

Consistently with its affirmative duty to take such administrative steps (again within reason) as will lead to integrated student bodies, the defendant city board should in this case have explored particular feasible alternatives in order to avoid decisions which will limit the extent of reasonable desegregation in the future. With an eye, in other words, to the possible costs of extensive cross-busing over a number of years, they should satisfy themselves as to whether a certain added construction expense is merited. The board, put simply, should not erect obstacles to the achievement of desegregation at lowest possible cost.

The Court shies at the task of comparing predictions as to the cost and effectiveness of various proposals said to contribute to desegregation. But neither the Court nor the school board can avoid the question whether, as part of the overall system, no alternative proposal to solve a capacity problem and achieve integration will involve less cost, now and in the long run, to the system for construction and transportation and less cost to the pupils in time, expense, and inconvenience related to transportation. Without further evidence of the studies made of alternative solutions, the Court cannot conclude that the defendants have met their burden.

█ The plaintiffs, as noted above, do not attack certain of the defendants' proposals. The evidence demonstrates, furthermore, that the city board may continue with them at present.

Dr. Little testified that on the basis of September, 1970, capacity figures and predictions as to the number of Richmond residents returning to city schools from former positions in Chesterfield County, where they are taught under an agreement ancillary to the recent annexation, a shortage of 1629 spaces at the junior high and high school levels will exist. (D. 10).

Dr. Foster, the plaintiffs' expert witness, testified, and the Court finds, that the proposed middle school of 1440

pupil capacity located near John Marshall High School would open as a desegregated facility if operated on a contiguous geographic zoning basis. If the city system were merged with that of Henrico County, or if it adopted non-contiguous zoning, the site and size selection would not make the school difficult to integrate (D. 91–92).

He also said, and the Court finds, that the site chosen for a middle school near George Wythe High School housing 1200 students would promote desegregation even on a contiguous zoning basis. If the more costly cross-busing technique were used, the site would be accessible to areas of black population to the north and east and across the James. The possibility of a metropolitan system would not affect his view. (D. 109–110).

In these instances, all the evidence is that the defendants have not elected a less effective alternative means to achieve desegregation; consequently no burden is cast on them further to justify their choices.

Dr. Foster also stated that the new high school in the annexed area would be required if the school board adhered to plans to operate four-year high schools, and that, if zone lines were gerrymandered or satellite zones used, the school could be desegregated in a municipal or metropolitan system. Only if a geographic neighborhood plan were instituted would the facility be heavily white. (D. 105–07).

Language and holdings in both *Swann* and Brewer v. School Board of City of Norfolk, 434 F.2d 408 (4th Cir. June 22, 1970), indicate that a school board's duty to desegregate at the secondary level is somewhat more categorical than at the elementary level. Moreover because, as Dr. Foster testified, high schools generally draw attendance from a wider geographic area than smaller elementary schools even on a purely contiguous basis, some transportation to the high school will probably be required whatever the pupil assignment pattern. Seen in this light, the high school project is not in conflict with the city board's duty to locate new facilities so that obstacles to integration are not created.

The injunction will remain in force as to certain projects which, according to Dr. Little's testimony, would not be begun even if the order were lifted. These are the expansion of the small Mary Scott Elementary School, the replacement of Westhampton Elementary School, the proposed elementary facility along Route 147 in the annexed area, and the middle school in the southern end of the annexed area.

The Court will state expressly that the June 20th injunction should not be construed to forbid any planning efforts that the defendants may wish to undertake, assist, or commission, up to and including preparing working drawings. At the same time the expenditure of funds and effort in planning while the injunction is in force cannot be considered a change of position made in justifiable reliance of the sort that a court of equity should consider when the issue of proceeding to build arises. The merits of any particular project will be considered on a clean slate when the defendants advise the Court that they wish to commence activities now enjoined.

What has been said to this point relates to the law as it stands. The Court cannot ignore entirely, however, the pendency of what will probably be important desegregation cases before the United States Supreme Court. Under nearly any foreseeable change in the law in upcoming rulings, however, the decision on the pending motions would be the same.

Especially if the Supreme Court rulings validate for all circumstances the policy of contiguous attendance zones, it would be strange if the construction of new schools which, under such a plan, would foreseeably be uniracial were thought to be consistent with the duty to desegregate the system.

If further efforts are required, as under current law in this circuit, it is

not credible that the expense and time involved would not bear on the means required. "Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." Brown v. Board of Education of Topeka, 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955). The duty would still remain on the school board to take care not to create impediments to the performance of its duty to operate integrated schools now and hereafter.

A word is in order concerning the prospect, which came into evidence during the depositions, that the failure to construct the facilities in the annexed area might give rise to further abandonment of the public system by white students. Of course the Court could not honor requests for delay in integration in order to accommodate those who find that constitutional requirement hard to accept. For the same reason the Court could not permit proposed construction to go forward in order to placate those who view it as possibly contributing to the continuation of segregated conditions. Monroe v. Board of Commissioners of City of Jackson, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).

By these remarks the Court intends no implication of bad faith on the part of school officials. Various community pressures, the motivation of which is not always easy to discern, no doubt partly spur their desire to recommence their building program. It is simply a fact of life that they are subject to such influences and to an extent mold their position in litigation accordingly. Under the law, however, this Court must insulate its decisions from certain considerations. "The proper functioning of our judicial system requires that subordinate courts and public officials faithfully execute the orders and directions of the Supreme Court. Any other course would be fraught with consequences, both disastrous and of great magnitude." Stanley v. Darlington County School District, 424 F.2d 195, 198 (4th Cir. 1970).

To say that the Court may not condone the parties' catering to the racial prejudices of some who may threaten white flight does not mean that the projects at issue here may not reflect genuine educational needs and cannot be evaluated as such. The Court accepts the defendants' proposals as presented in that spirit. There is nothing inconsistent with their constitutional duty in efforts to operate, during the transition to full integration and thereafter, a school system which offers all of its patrons an attractive opportunity for the greatest possible educational benefits with the minimum feasible disruption. The law seeks the same ends.

## ORDER VACATING INJUNCTION IN PART

For the reasons stated in the memorandum of the Court this day filed, it is adjudged and ordered that:

1. This Court's outstanding injunction of June 20, 1970, be, and the same is hereby, vacated in the following particulars:

a. Said order shall not bar the construction of a middle school proposed to be located near the John Marshall High School.

b. Said order shall not bar the construction of a middle school proposed to be located near George Wythe High School.

c. Said order shall not bar the construction of a high school proposed to be located near the intersection of Walmsley Boulevard and Hopkins Road.

d. Said order shall not bar those covered thereby from undertaking, assisting, or commissioning planning for new school construction up to and including the preparation of working architectural drawings.

2. The order of June 20, 1970, otherwise remains in full force and effect.