Carolyn **BRADLEY** and Michael Bradley, infants, by Minerva Bradley, their mother and next friend, et al., Appellees,

v.

The **SCHOOL BOARD OF the CITY OF RICHMOND, VIRGINIA**, et al., Appellant.

No. 71–1774.

United States Court of Appeals, Fourth Circuit.

Heard March 7, 1972, Oct. 2, 1972.

Decided Nov. 29, 1972.

George B. Little, Richmond, Va. (John H. O'Brion, Jr., James K. Cluverius, and Browder, Russell, Little & Morris, Richmond, Va., and Conrad B. Mattox, Jr., City Atty., for City of Richmond, on brief), for appellant.

Louis R. Lucas, Memphis, Tenn. (Jack Greenberg, James Nabrit, III, Norman J. Chachkin, New York City, James R. Olphin and M. Ralph Page, Richmond, Va., on brief), for appellees.

Section III of the opinion, dealing with the application of Section 718 to the proceedings, before HAYNSWORTH, Chief Judge, and WINTER, CRAVEN, RUSSELL and FIELD, Circuit Judges (BUTZNER, Circuit Judge, being disqualified) sitting en banc.

Other parts of the cause before WINTER, CRAVEN and RUSSELL, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

This appeal challenges an award of attorney's fees made to counsel for plaintiffs in the school desegregation suit filed against the School Board of the City of Richmond, Virginia. Though the action has been pending for a number of years,[1] the award covers services only for a period from March, 1970, to January 29, 1971. It is predicated on two grounds: (1) that the actions taken and defenses entered by the defendant School Board during such period represented unreasonable and obdurate refusal to implement clear constitutional standards; and (2) apart from any consideration of obduracy on the part of the defendant School Board since 1970, it is appropriate in school desegregation cases, for policy reasons, to allow counsel for the private parties attorney's fees as an item of costs. The defendant School Board contends that neither ground sustains the award. We agree.

We shall consider the two grounds separately.

## I.

▮ This Court has repeatedly declared that only in "the extraordinary case" where it has been " 'found that the bringing of the action should have been unnecessary and was compelled by the school board's unreasonable, obdurate obstinacy' or persistent defiance of law", would a court, in the exercise of its equitable powers, award attorney's fees in school desegregation cases. Brewer v. School Board of City of Norfolk, Virginia (4th Cir. 1972) 456 F.2d 943, 949. Whether the conduct of the School Board constitutes "obdurate obstinacy" in a particular case is ordinarily committed to the discretion of the District Judge, to be disturbed only "in the face of compelling circumstances". Bradley v. School Board of City of Richmond, Virginia (4th

Cir. 1965) 345 F.2d 310, 321. A finding of obduracy by the District Court, like any other finding of fact made by it, should be reversed, however, if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. Gypsum Co. (1948) 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746; Wright-Miller, Federal Practice and Procedure, Vol. 9, p. 731 (1971). We are convinced that the finding by the District Court of "obdurate obstinacy" on the part of the defendant School Board in this case was error.

Fundamental to the District Court's finding of obduracy is its conclusion that the litigation, during the period for which an allowance was made, was unnecessary and only required because of the unreasonable refusal of the defendant School Board to accept in good faith the clear standards already established for developing a plan for a non-racial unitary school system. This follows from the pointed statements of the Court in the opinion under review that, "Because the relevant legal standards were clear it is not unfair to say that the litigation (in this period) was unnecessary", and that, "When parties must institute litigation to secure what is plainly due them, it is not unfair to characterize a defendant's conduct as obstinate and unreasonable and as a perversion of the purpose of adjudication, which is to settle actual disputes."[2] At another point in its opinion, the Court uses similar language, declaring that "the continued litigation herein (has) been precipitated by the defendants' reluctance to accept clear legal direction, * * *."[3] It would appear, however, that these criticisms of the conduct of the Board, upon which, to such a large extent, the Court's award rests, represent exercises in hindsight rather than appraisal of the Board's action in the light of the law as it then ap-

---

1. See Note 1 in majority opinion of Bradley v. School Board of City of Richmond, Virginia, 4th Cir., 462 F.2d 1058, decided June 5, 1972, for history of this litigation.

2. See, 53 F.R.D. 28 at p. 39.

3. 53 F.R.D. at p. 40.

peared.[4] The District Court itself recognized that, during this very period when it later found the Board to have been unreasonably dilatory, there was considerable uncertainty with reference to the Board's obligation, so much so that the Court had held in denying plaintiffs' request for mid-school year relief in the fall of 1970, that "it would not be reasonable to require further steps to desegregate * * *," giving as its reason: "Because of the nearly universal silence at appellate levels, which the Court interpreted as reflecting its own hope that authoritative Supreme Court rulings concerning the desegregation of schools in major metropolitan systems might bear on the extent of the defendants' duty."[5] In fact, in July, 1970, the Court was writing to counsel that, "In spite of the guidelines afforded by our Circuit Court of Appeals and the United States Supreme Court, there are still many practical problems left open, as heretofore stated, including to what extent school districts and zones may or must be altered as a constitutional matter. A study of the cases shows almost limitless facets of study engaged in by the various school authorities throughout the country in attempting to achieve the necessary results."[6] The District Court had, also, earlier defended the School Board's request of a stay of an order entered in the proceedings on August 17, 1970, stating: "Their original (the School Board's) requests to the Fourth Circuit that the matter lie in abeyance were undoubtedly based on valid and compelling reasons, and ones which the Court has no doubt were at the time both appropriate and wise, since defendants understandably anticipated a further ruling by the United States Supreme Court in pending cases; * * *."[7] Earlier in 1970, too, the Court had taken note of the legal obscurity surrounding what at that time was perhaps the critical issue in the proceeding, centering on the extent of the Board's obligation to implement desegregation with transportation. Quoting from the language of Chief Justice Burger in his concurring opinion in Northcross v. Board of Education of Memphis, Tenn. City Schools, (1970) 397 U.S. 232, 237, 90 S.Ct. 891, 25 L.Ed.2d 426, the District Court observed that there are still practical problems to be determined, not the least of which is "to what extent transportation may or must be provided to achieve the ends sought by prior holdings of the Court."[8] In fact, the District Court had during this very period voiced its own perplexity, despairingly commenting that "no real hope for the dismantling of dual school systems (in the Richmond school system) appears to be in the offing unless and until there is a dismantling of the all Black residential areas."[9] At this time, too, as the District Court pointed out, there was some difficulty in applying even the term "unitary school system".[10] In summary, it was manifest in 1970, as the District Court had repeatedly stated, that, while *Brown* and other cases had made plain that segregated schools were invalid, and that it was the duty of the School Board to establish a non-racial unitary system, the practical problems involved and the precise standards for establishing such a unitary system, especially for an urbanized school system—which incidentally

---

4. See Monroe v. Board of Com'rs of City of Jackson, Tenn. (6th Cir. 1972) 453 F.2d 259, 263:

   "In determining whether this Board's conduct was, as found by the District Court, unduly obstinate, we must consider the state of the law as it then existed."

5. 53 F.R.D. at p. 33.

6. See, Joint Appendix 74–75.

7. 325 F.Supp. 828 at p. 832.

8. 317 F.Supp. at p. 575.

9. 317 F.Supp. at p. 566.

10. That this term "unitary" is imprecise, the District Court stated in 325 F.Supp. at p. 844:

    "The law establishing what is and what is not a unitary school system lacks the precision which men like to think imbues other fields of law; perhaps much of the public reluctance to accept desegregation rulings is attributable to this indefiniteness."

were the very issues involved in the 1970 proceedings—had been neither resolved nor settled during 1970; in fact, the procedures are still matters of lively controversy.[11] It would seem, therefore, manifest that, contrary to the premise on which the District Court proceeded in its opinion, the legal standards to be followed by the Richmond School Board in working out an acceptable plan of desegregation for its system were not clear and plain at any time in 1970 or even 1971.

It is true, as the District Court indicates, that the Supreme Court in 1968 had, in Green v. County School Board (1968) 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716, found "freedom-of-choice" plans that were not effective unacceptable instruments of desegregation, and that the defendant Board, following that decision, had taken no affirmative steps on its own to vacate the earlier Court-approved "freedom-of-choice" plan for the Richmond School system, or to submit a new plan to replace it. In Green, the Court had held that, "if there are reasonably available other ways, such for illustration as zoning, promising speedier and more effective conversion to a unitary nonracial school system, 'freedom of choice' must be held unacceptable." [12] In suggesting zoning, Green offered a ready and easily applied alternative to "freedom-of-choice" for a thinly populated, rural school district such as Old Kent, but other than denying generally legitimacy to freedom-of-choice plans, Green set forth few, if any, standards or benchmarks for fashioning a unitary system in an urbanized school district, with a majority black student constituency, such as the Richmond school system. In fact, a commentator has observed that "Green raises more questions than it answers".[13] Perhaps the School Board, despite the obvious difficulties, should have acted promptly after the Green decision to pre-

pare a new plan for submission to the Court. Because of the vexing uncertainties that confronted the School Board in framing a new plan of desegregation, problems which, incidentally, the District Court itself finally concluded could only be solved by the drastic and novel remedy of merging independent school districts,[14] and pressed with no local complaints from plaintiffs or others, it was natural that the School Board would delay. Mere inaction under such circumstances, however, and in the face of the practical difficulties as reflected in the later litigation, cannot be fairly characterized as obdurateness. Indeed the plaintiffs themselves were in some apparent doubt as to how they wished to proceed in the period immediately after Green and took no action until March, 1970. Even then they offered no real plan, contenting themselves with demanding that the School Board formulate a unitary plan, and with requesting an award of attorney's fees. It is unnecessary to pursue this matter, however, since the District Court does not seem to have based its award upon the inaction of the School Board prior to March 10, 1970, but predicated its award on the subsequent conduct of the School Board.

The proceedings, to which this award applies, began with the filing by the plaintiffs of their motion of March 10, 1970, in which they asked the District Court to "require the defendant school board forthwith to put into effect a method of assigning children to public schools and to take other appropriate steps which will promptly and realistically convert the public schools of the City of Richmond into a unitary non-racial system from which all vestiges of racial segregation will have been removed; and that the Court award a reasonable fee to their counsel to be assessed as costs." With the filing of this motion,

11. Bradley v. School Board of City of Richmond, Virginia, decided June 5, 1972, *supra*.

12. 391 U.S. at p. 441, 88 S.Ct. at p. 1696.

13. 82 Harv.L.Rev. 116.

14. A measure found inappropriate by this Court in Bradley v. School Board of City of Richmond, Virginia, decided June 5, 1972, *supra*.

the Court ordered the defendant School Board to "advise the Court if it is their position that the public schools of the City of Richmond, Virginia are being operated in accordance with the constitutional requirements to operate unitary schools as enunciated by the United States Supreme Court." It added that, should the defendant School Board not contend that its present operations were in compliance, it should "advise the Court the amount of time" needed "to submit a plan." Promptly, within less than a week after the Court issued this order, the School Board reported to the Court that (1) it had been advised that it was not operating "unitary schools in accordance with the most recent enunciations of the Supreme Court of the United States" and (2) it had requested HEW, and HEW had agreed, to make a study and recommendations that would "ensure" that the operation of the Richmond Schools was in compliance with the decisions of the Supreme Court. This HEW plan was to be made available "on or about May 1, 1970" and the Board committed itself to submit a proposed plan "not later than May 11, 1970". A few days later, the District Court held a pre-trial hearing and specifically inquired of the School Board as to the necessity for "an evidentiary hearing" on the legality of the plan under which the schools were then operating. The defendant School Board candidly advised the Court that, so far as it was concerned, no hearing was required since it "admitted that their (its) freedom of choice plan, although operating in accord with this Court's order of March 30, 1966, was operating in a manner contrary to constitutional requirements." [15] The District Court characterizes this concession by the School Board as "reluctantly" given, and its finding of reluctance at this early stage in the proceeding is an element in the District Court's conclusion that the School Board has been obdurate. The record, however, provides no basis for this characterization of the conduct of the School Board. The School Board had manifested no reluctance to concede that its existing plan of operation did not comply with *Green*. When called on by the Court for a response to plaintiffs' motion, it had acted with becoming dispatch to enlist the assistance of that agency of Government supposed to have expertise in the area of school desegregation and charged by law with the duty of assisting school districts with such problems. Every action of the School Board at this stage could be said to be reasonably calculated to facilitate the progress of the proceedings and to lighten the burdens of the Court. This conclusion is supported by the fact that what the Board did was apparently found acceptable and helpful by both the Court and the plaintiffs. Neither contended that the proposed time-table was dilatory or that the use of HEW was an inappropriate agency to prepare an acceptable plan. As a matter of fact, the utilization of the services of HEW under these circumstances was an approved procedure at the time, one recommended by courts repeatedly to school districts confronted with the same problem as the Richmond schools.[16]

On May 4, 1970, HEW submitted to the School Board its desegregation plan,

15. 338 F.Supp. 67, 71.

16. Green v. School Board of City of Roanoke, Virginia (4th Cir. 1970) 428 F.2d 811, 812; Monroe v. County Bd. of Education of Madison Co., Tenn. (6th Cir. 1971) 439 F.2d 804, 806; Note, The Courts, HEW and Southern School Desegregation, 77 Yale L.J. 321 (1967).

During oral argument, counsel for the plaintiffs contended that HEW had in recent months become a retarding factor in school desegregation actions, citing Norcross v. Board of Education of Memphis, Civ. No. 3931 (W.D.Tenn., Jan. 12, 1972.) Without passing on the justice of the criticism, it must be borne in mind this was not the view in 1970, as is evident in the decisions cited. This argument emphasizes again, it may be noted, the erroneous idea that the reasonableness of the Board's conduct in 1970 is to be tested, not by circumstances as they were understood then, but in the light of 1972 circumstances.

prepared, to quote HEW, in response to the Board's own "expressed desire to achieve the goal of a unitary system of public schools and in accordance with our interpretation of action which will most soundly achieve this objective." In formulating its plan, HEW received no instructions from the School Board, "Except to try our best to meet the directive of the Court Order and they gave me the Court Order." There were no meetings of the School Board and HEW "until the plan had been developed in almost final form." Manifestly, the Board acted throughout the period when HEW was preparing its plan, in utmost good faith, enjoining HEW "to meet the directive" of the Court and relying on that specialized agency to prepare an acceptable plan. The Board approved, with a slight, inconsequential modification, the plan as prepared by HEW and submitted it to the Court on May 11, 1970. The District Court faults the Board for submitting this plan, declaring that the plan "failed to pass legal muster because those who prepared it were limited in their efforts further to desegregate by self-imposed restrictions on available techniques" [17] and emphasizing that its unacceptability "should have been patently obvious in view of the opinion of the United States Court of Appeals for the Fourth Circuit in Swann v. Charlotte-Mecklenburg Board of Education, 431 F.2d (138) (4th Cir. 1970), which had been rendered on May 26, 1970." [18] The failure to use "available techniques" such as "busing and satellite zonings" and whatever "self-imposed limitations" may have been placed on the planners were not the fault of the School Board but of HEW, to whom the School Board, with the seeming approval of the Court and the plaintiffs, had committed without any restraining instructions the task of preparing an acceptable plan. Moreover, at the time the plan was submitted to the Court by the School Board, Swann had not been decided by this Court. And when the Court disapproved the HEW plan, the Board proceeded in good faith to prepare on its own a new plan that was intended to comply with the objectives stated by the Court.

The Court did find some fault with the Board because, "Although the School Board had stated, as noted, that the free choice system failed to comply with the Constitution, producing as it did segregated schools, they declined to admit during the June (1970) hearings that this segregation was attributable to the force of law (transcript, hearing of June 20, 1970, at 322)" and that as a result, "the plaintiffs were put to the time and expense of demonstrating that governmental action lay behind the segregated school attendance prevailing in Richmond". [19] This claim of obstruction on the part of the Board is based on the latter's refusal to concede, in reply to the Court's inquiry, "that free choice did not work because it was *de facto* segregation". [20] It is somewhat difficult to discern the importance of determining whether the "free choice" plan represented *"de facto* segregation" or not: It was candidly conceded by the School Board that "free choice", as applied to the Richmond schools, was impermissible constitutionally, and this concession was made whether the unacceptability was due to *"de facto"* segregation or not. [21] In a school system such as that of Richmond, where there had been formerly *de jure* segregation, *Green* imposed on the School Board the "duty to eliminate racially identifiable schools even where their preservation results from educationally sound pupil assignment policies." [22] The School Board's duty was to eliminate, as far as feasible, "racially identifiable schools" in its sys-

---

17. See, 53 F.R.D. at p. 31.

18. See, 338 F.Supp. at p. 71.

19. See, 53 F.R.D. at p. 30.

20. See Joint Appendix 47, Tr. p. 322.

21. See 345 F.2d 322.

22. 82 Harv.L.Rev. 113; cf. Ellis v. Board of Public Instruction of Orange Co., Fla. (5th Cir. 1970) 423 F.2d 203, 204.

tem.[23] The real difficulty with achieving this result was that, whatever may have been the reasons for its demographic and residential patterns,[24] there was, as the Court later reluctantly recognized, no practical way to achieve a racially balanced mix, whatever plan of desegregation was adopted. With a school population approximately 65 per cent black, it was not possible to avoid having schools that would be heavily black.[25] The constitutional obligation thus could, in that setting, only have as its goal the one stated by the District Court, i. e., "to the extent feasible within the City of Richmond." [26] Indeed, it was the very intractability of the problem of achieving a "viable racial mix" that prompted the Court to suggest in July, 1970, that it might be appropriate for the defendant School Board to discuss with the school officials of the contiguous counties the feasibility of consolidation of the school districts, "all of which may tend to assist them in their obligation".[27]

The Court's finding of obstruction particularly centers on the substitute plan which the School Board proposed on July 23, 1970, in accordance with the Court's previous directive. It found two objections to the plan. The objections are actually part of one problem, i.e., transportation. The first objection was that the plan did not require as much integration in the elementary grades as in the higher grades. Such a difference in treatment, however, the Court found had some support in both Swann [28] and Brewer.[29] An increase in the desegregation of the elementary

---

23. The very term "racially identifiable" has received no standard definition. In Beckett v. School Board of City of Norfolk (D.C.Va.1969) 308 F.Supp. 1274, 1291, rev. on other grounds, 4th Cir., 434 F.2d 408, the Court found that a school in which the representation of the minority group was 10 per cent or better was not "racially identifiable". Dr. Pettigrew, the expert witness on whom the District Court in this proceeding relied heavily and who testified in Beckett, used 20 per cent in determining "racially identifiable" school population. See 308 F.Supp. 1291. The recent case of Yarbrough v. Hulbert-West Memphis School Dist. No. 4 (8th Cir. 1972) 457 F.2d 333, 334, apparently would define as "racially identifiable" any school where the minority, whether white or black, was less than 30 per cent. The District Court in this proceeding would, in its application of the term "racially identifiable," construe the term as embracing the idea of a "viable racial mix" in the school population, which will not lead to a desegregation of the system. 338 F.Supp. at pp. 194–195. Actually, as Dr. Pettigrew indicated, it would seem the term "racially identifiable" has no fixed definition, and its application will vary with the circumstances of the particular situation, just as a plan of desegregation itself will vary, since, as the Court said in Green, supra, 391 U.S. at p. 439, 88 S.Ct. at p. 1695, "There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case."

24. That school policy is generally a minimal factor in such situation, see 85 Harv.L.Rev. 77. In fact, the use of zoning and restrictive covenants as instruments of segregation is far more typical of northern than southern communities. See, McCloskey, The Modern Supreme Court (Harv., 1972), pp. 109–110:
"In fact, the maintenance of 'black ghettos' in the cities was the north's substitute for the segregation laws of the south * * *. The President's Committee on Civil Rights reported in 1947 that the amount of land covered by racial restriction in Chicago was as high as 80 per cent and that, according to students of the subject, virtually all new subdivisions are blanketed by these covenants."

25. Cf., United States v. Choctaw County Board of Education (D.C.Ala.1971) 339 F.Supp. 901, 903.

26. See 325 F.Supp. 835.

27. See Joint Appendix 74.

28. 431 F.2d 138.

29. In 324 F.Supp. 456, 468, the Court said:
"Language and holdings in both Swann and Brewer v. School Board of City of Norfolk, 434 F.2d 408 (4th Cir. June 22, 1970), indicate that a school board's duty to desegregate at the secondary level is somewhat more categorical than at the elementary level."

grades, however, depended upon the purchase and use of a considerable amount of transportation equipment by the Board; and this was the basis of the second criticism that "the School Board had in August (1970) still taken no steps to acquire the necessary equipment." [30] The Court repeated this criticism with reference to the plaintiffs' mid-term motion made in the fall of 1970 for an amendment of defendant's approved interim plan which, for implementation, "required the purchase of transportation facilities which the School Board still would only say it would acquire if so ordered." [31] Yet at the very time when the action of the School Board in failing to buy buses was thus being found to be "unreasonably obdurate", the Court itself was declaring on August 7, 1970, that "it seems to me it would be completely unreasonable to force a school system that has no transportation, and you all don't have any to any great extent, to go out and buy new busses when the United States Supreme Court may say that is wrong." [32] Again, as late as January 29, 1971, the Court, in refusing to order the immediate implementation of a plan submitted by the plaintiffs, which "would require the acquisition of additional transportation facilities not then available", found that "the possibility that forthcoming rulings (by the Supreme Court)" might make such acquisition unnecessary and a needless expense induced "the Court to decide that immediate reorganization of the Richmond system would be 'unreasonable' under *Swann*." [33] If the Court did not feel it was reasonable in January, 1971, to require the Board to purchase additional buses, it certainly cannot be said that, in the period of uncertainty in 1970, the failure of the School Board to propose such acquisition, justifies any charge of unreasonableness, much less obdurateness or ac-

tion "in defiance of law" or taken in "bad faith".

The conclusion of the District Court that the Board was "unreasonably obdurate", it seems, was influenced by the feeling, repeated in a number of the Court's opinions, that "Each move (by the Board) in the agonizingly slow process of desegregation has been taken unwillingly and under coercion." [34] The record, as we read it, though, does not indicate that the Board was always halting, certainly not obstructive, in its efforts to discharge its legal duty to desegregate; nor does it seem that the Court itself had always so construed the action of the Board. In June, 1970, the Court remarked, that, while not satisfied "that every reasonable effort has been made to explore" all possible means of improving its plan, it was "satisfied Dr. Little and Mr. Adams (the school administrators) have been working day and night diligently to do the best they could, the School Board too." [35] It may be that in the early years after *Brown* the School Board was neglectful of its responsibility, but, beginning in the middle of 1965, it seems to have become more active. Moreover, the promptness and vigor with which the Board adopted and pressed the suggestion of the Court that steps be considered in connection with a possible consolidation of the Richmond schools with those of Chesterfield and Henrico Counties must cast doubt upon any finding that the Board was unwilling to explore any avenue, even one of uncharted legality, in the discharge of its obligation. The Court wrote its letter suggesting a discussion with the other counties looking to such possible consolidation on July 6, 1970. The letter was addressed to the attorneys for the plaintiffs but a copy went to counsel for the School Board. Nothing was done by counsel for the plaintiffs as a result of this letter but on July 23,

---

30. 53 F.R.D. 32.

31. 53 F.R.D. 32–33.

32. Joint Appendix 92–3.

33. See, Joint Appendix 132, 134, 135.

34. 338 F.Supp. 103; see, also, 53 F.R.D. 39.

35. See, Joint Appendix 92.

1970, the Board moved the Court for leave to make the School Boards of Chesterfield and Henrico Counties parties and to serve on them a third-party complaint wherein consolidation of their school systems with that of the Richmond systems would be required. The Board thereafter took the "laboring oar" in that proceeding. Neither it nor its counsel has been halting in pressing that action, despite substantial local disapproval.[36]

▪ It is clear that the Board, in attempting to develop a unitary school system for Richmond during 1970, was not operating in an area where the practical methods to be used were plainly illuminated or where prior decisions had not left a "lingering doubt" as to the proper procedure to be followed.[37] Even the District Court had its uncertainties. All parties were awaiting the decision of the Supreme Court in *Swann*. Before *Swann* was decided, however, the parties were engaged in an attempt to develop a novel method of desegregating the Richmond school system for which there was not at the time legal precedent. Nor can it be said that there was not some remaining confusion, at least at the District level, about the scope of *Swann* itself.[38] The frustrations of the District Court in its commendable attempt to arrive at a school plan that would protect the constitutional rights of the plaintiffs and others in their class, are understandable, but, to some extent, the School Board itself was also frustrated. It seems to us unfair to find under these circumstances that it was unreasonably obdurate.

## II.

The District Court enunciated an alternative ground for the award it made. It concluded that school desegregation actions serve the ends of sound public policy as expressed in Congressional acts and are thus actually public actions, carried on by "private-attorneys general," who are entitled to be compensated as a part of the costs of the action. Specifically, it held that "exercise of equity power requires the Court to allow counsel's fees and expenses, in a field in which Congress has authorized broad equitable remedies 'unless special circumstances would render such an award unjust.'"[39] Apparently, though, the District Court would limit the application of this alternative ground for the award to those situations where the rights of the plaintiff were plain and the defense manifestly without merit. This conclusion follows from the fact that the Court finds this right of an award only arose in 1970 and 1971, when it might be presumed from previous expressions in the opinion, the Court concluded that all doubts about how to achieve a non-racial unitary school system had been resolved, and any failure of a school system to inaugurate such a system was obviously in bad faith and in defiance of law. That follows from this statement made by way of preface to its exposition of its alternative ground:

> "Passing the question of the appropriateness of allowing fees on the basis of traditional equitable standards, the Court is persuaded that in 1970 and 1971 the character of school desegregation litigation has become such

---

36. See, 338 F.Supp. 67, 100–101.

37. See, Local No. 149 I.U., U.A., A. & A.I.W. v. American Brake Shoe Co. (4th Cir. 1962) 298 F.2d 212, 216, cert. den. 369 U.S. 873, 82 S.Ct. 1142, 8 L.Ed.2d 276.

   In Pierson v. Ray, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967), it was stated that "a police officer is ·not charged with predicting the future course of constitutional law." By like token, it would seem a school board should not be required, under penalty of

being charged with obdurateness and being saddled with onerous attorneys' fees, to anticipate or predict the future course of "constitutional law" in the murky area of school desegregation.

38. See, Winston-Salem/Forsyth County Board of Education v. Scott, opinion of Chief Justice Burger, dated August 31, 1971, 404 U.S. 1221, 92 S.Ct. 1236, 31 L.Ed.2d 441.

39. See 53 F.R.D. at p. 42.

that full and appropriate relief must include the award of expenses of litigation. This is an alternative ground for today's ruling." [40]

If this is the basis for the Court's alternative ground, it really does not differ from the rule that has heretofore been followed consistently by this Court that, where a defendant defends in bad faith or in defiance of law, equity will award attorney's fees. The difficulty with the application of the Court's alternative ground for an award on this basis, though, is its assumption that by 1970 the law on the standards to be applied in achieving a unitary school system had been clearly and finally determined. As we have seen, there was no such certainty in 1970; indeed it would not appear that such certainty exists today. And it is this very uncertainty that is the rationale of the decision in Kelly v. Guinn (9th Cir. 1972) 456 F.2d 100, 111, where the Court, citing both the District Court's opinion involved in this appeal (53 F.R.D. 28), and Lee v. Southern Home Sites Corp. (5th Cir. 1970) 429 F.2d 290, 295–296,[41] sustained a denial of attorney's fees in a school integration case, because:

"First, there was substantial doubt as to the school district's legal obligation in the circumstances of this case; the district's resistance to plaintiffs' demands rested upon that doubt, and not upon an obdurate refusal to implement clear constitutional rights. Second, throughout the proceedings the school district has evinced a willingness to discharge its responsibilities under the law when those duties were made clear."

If, however, an award of attorney's fees is to be made as a means of implementing public policy, as the District Court indicates in its exposition of its alternative ground of award, it must normally find its warrant for such action in statutory authority.[42] Congress, however, has made no provision for such award in school desegregation cases. Legislation to such effect, included in a bill to assist in the integration of educational institutions, was introduced in 1971 in Congress but it was not favorably considered. Moreover, in the Civil Rights Act of 1964, it expressly provided for such award in both the equal employment opportunity [43] and the public accommodations sections [44] but pointedly omitted to include such a provision in the public education section.[45] In giving effect to this contrast in the several titles of the Civil Rights Act of 1964, and in affirming that any award of attorney's fees in a school desegregation case must be predicated on traditional equitable standards, the Court in Kemp v. Beasley (8th Cir. 1965) 352 F.2d 14, 23, said:

"Congress by specifically authorizing attorney's fees in Public Accommodation cases and not making allowance in school segregation cases clearly indicated that insofar as the Civil Rights Act is concerned, it does not authorize the sanction of legal fees in this type of action. The doctrine of *Expressio unium est exclusio alterius* applies here and is dispositive of this contention."

The same conclusion was reached in Monroe v. Board of Com'rs of City of Jackson, Tenn. (6th Cir. 1972) 453 F.2d 259, 262–263, note 1, where an award, though sustained, was sustained on the ground of "unreasonable, obdurate obstinacy" as enunciated in Bradley v. School Board of Richmond, Virginia (4th Cir. 1965) 345 F.2d 310, 321, and not

---

40. See, 53 F.R.D. at p. 41.

41. See, also, Lee v. Southern Home Sites Corp. (5th Cir. 1971) 444 F.2d 143.

42. See Fleischmann v. Maier Brewing Co. (1967) 386 U.S. 714, 717, 87 S.Ct. 1404, 18 L.Ed.2d 475; see, also, Brewer v. School Board of City of Norfolk, Virginia, *supra*, note 22, 456 F.2d at p. 950.

43. See, Section 2000e–5(k), 42 U.S.C.

44. See, Section 2000a–3(b), 42 U.S.C.

45. Section 2000c–7, 42 U.S.C.; and see, United States v. Gray (D.C.R.I.1970) 319 F.Supp. 871, 872–873. See, however, Note 57, post.

as a vehicle for the enforcement of public policy. To the same effect is United States v. Gray, *supra*.

It is suggested that Mills v. Electric Auto-Lite (1970) 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593, and Lee v. Southern Home Sites Corp. (5th Cir. 1971) 444 F.2d 143, sustain this alternative award as in the nature of a sanction designed to further public policy. Any reliance on *Mills* is "misplaced, however, because conferral of benefits, not policy enforcement, was the *Mills* Court's stated justification for its holding." 50 Tex.L.Rev. 207 (1971).[46] In fact, the award in *Mills* was based on the same concept of benefit as was used to support the award in Trustees v. Greenough (1881) 105 U.S. 527, 26 L.Ed. 1157. 36 Mo.L.Rev. 137 (1971). Equally inapposite is *Lee.* Though filed under Section 1982, it was like unto, and, so far as relief was concerned, should be treated similarly as an action under Section 3612(c), 42 U.S.C., in which attorney's fees are allowable.[47] By this reasoning, the Court sought to bring the award within the umbrella of a parallel specific statutory authorization.[48] There is no basis for such a rationale here.

If, however, the rationale of *Mills* is to be stretched so as to provide a vehicle for establishing judicial power justifying the employment of award of attorney's fees to promote and encourage private litigation in support of public policy as expressed by Congress or embodied in the Constitution, it will launch courts upon the difficult and complex task of determining what is public policy, an issue normally reserved for legislative determination, and, even more difficult, which public policy warrants the encouragement of award of fees to attorneys for private litigants who voluntarily take upon themselves the character of private attorneys-general.[49] Counsel in environmental cases would claim such a role for their services.[50] The protection of historical houses and monuments against the encroachment of highways has been cloaked within the mantle of public interest and it would be argued should receive the encouragement of an award.[51] Consumers' suits are clearly to be considered.[52] Apportionment suits would justify awards under this theory.[53] First Amendment rights are often spoken of as preferred constitutional rights. Attacks upon statutes infringing free speech would, under this theory, command an allowance. But it must be emphasized that whether the enforcement of Congressional purpose in

46. See, also Kahan v. Rosenstiel (3d Cir. 1970) 424 F.2d 161, 166:
    "In the *Mills* opinion, Justice Harlan noted that the plaintiffs' suit *conferred a benefit* on all the shareholders * * *." (Italics added.)

47. See, particularly note 2, p. 147, 444 F.2d.
    This case has been criticized in 50 Tex. L.Rev. 207. Thus, the commentator finds untenable the case's attempt to identify its award with the statuory authorization provided in Section 3612(c), because, "Under the latter statute (section 3612) the court may not award attorney's fees to a plaintiff financially able to pay his own fees." (Page 208).

48. Knight v. Auciello (1st Cir. 1972) 453 F.2d 852, is a similar case, involving discrimination proscribed by Section 1982, 42 U.S.C.

49. See, Note, The Allocation of Attorney's Fees After Mills v. Electric Auto-

Lite Co., 38 U.Chi.L.Rev. 316, at pp. 329–30 (1971).

50. See, Section 4332(2), et seq., 42 U.S.C.; Environmental Defense Fund v. Corps of Eng. of U. S. Army, (D.C.Ark.1971) 325 F.Supp. 749; Environmental Defense Fund, Inc. v. Corps of Engineers (D.C.D.C.1971) 324 F.Supp. 878; Businessmen Affected Severely, etc. v. D. C. City Council (D.C.D.C.1972) 339 F.Supp. 793.

51. See, Section 461, 16 U.S.C., and Section 4331(b)(4), 42 U.S.C.; West Virginia Highlands Conserv. v. Island Creek Coal Co. (4th Cir. 1971) 441 F.2d 232; Cf., Ely v. Velde (D.C.Va.1971) 321 F.Supp. 1088.

52. See, 38 U.Chi.L.Rev. 316.

53. Actually, an alternative award has been made in such a case. Sims v. Amos (3-judge ct. Ala.1972) 340 F.Supp. 691, (filed March 17, 1972).

all these cases commands an award of attorney's fees is a matter for legislative determination. And Congress has not. been reticent in expressing such purpose in those cases where it conceives that such special award is appropriate. In many instances, where Congress has enacted statutes designed to further public purpose, it has bulwarked their enforcement with provisions for the allowance of counsel fees to attorneys for private parties invoking such statutes; in other cases it has denied such awards.[54] In some of the statutes authorizing such allowances, the award is, as in the statute involved in Newman v. Piggie Park Enterprises (1968) 390 U. S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263, either mandatory or practically so; in others it is discretionary[55] and the granting of awards is generally made through the use of the same guidelines as motivate courts in making awards under the traditional equity rule. Should the courts, in those instances where Congress has failed to grant the right, review the legislative omission and sustain or correct the omission as the court's judgment on public policy suggests? This, it seems to us, would be an unwarranted exercise of judicial power. After all, Courts should not assume that Congress legislates in ignorance of existing law, whether statutory or precedential. Accordingly, when Congress omits to provide specially for the allowance of attorney's fees in a statutory scheme designed to further a public purpose, it may be fairly accepted that it did so purposefully, intending that the allowance of attorney's fees in cases brought to enforce the rights there created or recognized should be allowed only as they may be authorized under the traditional and long-established principles as stated in Sprague v. Ticonic Bank (1939) 307 U. S. 161, 166, 59 S.Ct. 777, 83 L.Ed. 1184. Such consideration, it would seem, was

the compelling reason that prompted one commentator to offer the apt *caveat* that the determination of public policy as a predicate for such awards should be more safely left with Congress and not undertaken by the Courts. Thus in 50 Tex.L.Rev. 209 (1971), it is stated:

"The decision, (referring to *Lee*) however, sanctions excessive judicial discretion that may emasculate the general rule against fee awards and inject more unpredictability into the judicial process. The legislature should formulate a rule that would promote predictability and utilize the power inherent in fee allocation to pursue the goals it desires to achieve, one of which would be equal access to the courts."

Even the author of the Note, The Allocation of Attorney's Fees After Mills v. Electric Auto-Lite Co., 38 U.Chi.L.Rev., 316, though sympathetic to the extension of *Mills* to cover awards of attorney's fees in support of public policy, recognizes that a general policy, applicable to all cases, on the award of attorney's fees should be adopted, concluding its review of the subject with this comment:

"Logically, one of two things must happen: either judicial discretion to grant fees on policy grounds will result in universal fee shifting from the successful party, or the courts will withdraw to the traditional position, denying any fee transfer without specific statutory authorization. *Mills* represents an uneasy half-way house between these two extremes." (Page 336)

■ We find ourselves in agreement with the conclusion that if such awards are to be made to promote the public policy expressed in legislative action, they should be authorized by Congress

---

54. See Annotation, 8 L.Ed.2d 894, at pp. 922–32, for a listing of statutes authorizing an award of attorney's fees. To this list should be added Section 1640, 15 U.S.C. (Truth-in-Lending Act).

55. See, for instance, Section 153, 43 U.S.C.; United Transportation Union v. Soo Line RR Co. (7th Cir. 1972) 457 F.2d 285.

and not by the courts.[56] This is especially true in school cases, where the guidelines are murky and where harried, normally uncompensated School Boards must tread warily their way through largely uncharted and shadowy legal forests in their search for an acceptable plan providing what the courts will hopefully decide is a unitary school system.

■ Accordingly, until Congress authorizes otherwise awards of attorney's fees in school desegregation cases must rest upon the traditional equitable standards as stated in Bradley v. Richmond School Board (4th Cir. 1965) 345 F.2d 310, which provide ample scope for the award in appropriate cases.

### III.

After the above opinion had been prepared but not issued, the Congress enacted Section 718 of the Emergency School Aid Act. The appellees promptly called to the Court's attention this Section, suggesting that it provided an alternative basis for the award made. They construed the reference in the Section to "final order" to embrace any appealable order dealing with any issue raised in a school desegregation case. Any order which had been appealed and was pending on appeal, unresolved, on the effective date of the Section (i. e., July 1, 1972), they argued, could provide

a proper vehicle for an award under the Section.[56a]

Since this issue of the application of Section 718 was raised simultaneously in a number of other pending appeals, it was determined to withhold the above opinion for the time being, and to consider *en banc* the reach of Section 718, as applied both to this case and to the other related appeals. Such *en banc* hearing has been had and the Court has concluded that Section 718 does not reach services rendered prior to June 30, 1972.[57]

■ Were it to be construed as extending to any "final order," entered as "necessary to secure compliance," and pending unresolved on the effective date of the Act (which is the plaintiffs' construction of the sweep of the Section), such Section could not be used as a vehicle to validate this award. This is so because there was no "final order" pending unresolved on appeal on June 30, 1972, to which this award could attach. The only proceeding pending unresolved in this case on May 26, 1971, when the District Court issued its order allowing attorney's fees, was the action begun on motion of the School Board itself to require the merger of the Richmond schools with those of the contiguous counties of Chesterfield and Henrico. All orders issued prior to that date in this desegregation action had long since become final

---

56. It is interesting that in all the cases where the right to make an award for policy reasons has been stated, it has been stated simply as an alternative ground to a finding of unreasonable obduracy. See, 53 F.R.D. at pp. 39–42, and *Lee, supra,* 444 F.2d at p. 144. In *Sims, supra,* at p. 693 of 340 F.Supp., the Court found that, "The history of the present litigation is replete with instances of the Legislature's neglect of, and even total disregard for, its constitutional obligation to reapportion." In short, no court has yet predicated an award exclusively upon the promotion of public policy.

56a. During the course of the oral argument counsel for the appellees was asked to define the term "final order" as used in Section 718. His reply was,

" * * there is mention of final order in the legislative material—they use that term rather than a final judgment because in recognition of the peculiar nature of school cases,—that is, you may have a wave of litigation that would end up in a final decision by this court or the Supreme Court and then the case would again be relitigated later—that order which is appealable is a final order."

57. James v. Beaufort County Board of Education (72–1065); Copeland et al. v. School Board of City of Portsmouth, Virginia et al. (Nos. 71–1993 and 71–1994); Thompson v. School Board of City of Newport News, Virginia et al. (Nos. 71–2032 and 71–2033), 4th Cir., 472 F.2d 177, filed November 29, 1972.

and were not pending on appeal either on May 26 or on the date Section 718 became effective. Thus, on August 17, 1970, the District Court had approved the School Board's interim plan for the school year 1970–1. There was no appeal perfected from that order. The plaintiffs had moved on December 9, 1970, for additional relief but that motion had been denied by an order dated January 29, 1970, which, incidentally, was the same date used by the District Court for the cut-off of its allowance of attorney's fees. Again, there was no appeal from that order dismissing plaintiffs' application for relief, and, even if it be assumed that plaintiffs' attorneys are to be granted attorneys' fees when they do not prevail (an assumption clearly not permitted under the language of Section 718), the proceeding under which that order was entered was not pending when Section 718 became effective.[58] To restate: The only proceedings pending undetermined by an order that had not become final on the date Section 718 became effective was the action begun by the School Board and resulting in the order of the District Court dated January 10, 1972.[59] That order, which, it may be assumed, is still pending since the School Board is presently seeking certiorari, was reversed by this Court[60] and, unless the decision of this Court is in turn reversed, it will not support any allowance of attorneys' fees, since Section 718 authorizes allowance only when plaintiffs have prevailed.

Reversed.

WINTER, Circuit Judge (dissenting):

The in banc court holds that this case is not governed by § 718 of Title VII, "Emergency School Aid Act," of the Education Amendments of 1972. P.L. 92–318; 86 Stat. 235; 1972 U.S. Code and Admin. News, pp. 1908, 2051. The panel concludes both that the Richmond School Board was not guilty of "unreasonable, obdurate obstinacy" and that plaintiffs were not entitled to recover counsel fees under the private attorney general concept. On all issues, I would conclude otherwise and I therefore respectfully dissent.

I.

Because I conclude not only that § 718 is applicable to this litigation, but also that, as a matter of statutory construction, its terms are met, I place my dissent from the panel's decision primarily on that ground. If, however, § 718 is treated as inapplicable to this case, I would affirm the district court, preferably on my concurring views in Brewer v. School Board of City of Norfolk, Virginia, 456 F.2d 943, 952–954 (4 Cir. 1972) cert. den. 406 U.S. 933, 92 S.Ct. 1778, 32 L.Ed.2d 136 (1972). Even if the obdurate obstinacy test controls, I would still affirm. As I read the record, I can only conclude that for the period for which an allowance of fees was made, the Richmond School Board was obdurately obstinate. Commendably, it seized the initiative in vindicating plaintiffs' rights by seeking to sustain a consolidation of school districts; but this was a latter-day conversion that occurred after the district court suggested that consolidation be explored. Until that time the record reflects the Board's stubborn reluctance to implement *Brown I* (Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed 873 (1954) in the light of Green v. County School Board of New Kent County, Va., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); Carter v. West Feliciana Parish School Board, 396 U.S. 226, 90 S.Ct. 467, 24 L.Ed.2d 382

58. It is true that on January 29, 1971, the School Board submitted to the District Court its proposed plan for the operation of the Richmond schools for the school year 1971–2. There seems to have been either no dispute over this plan or the

proposal was swallowed up in the more expansive merger action.

59. 338 F.Supp. 67.

60. 462 F.2d 1058.

(1969); and, while the litigation was progressing, Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The history of the litigation, as set forth in the opinion of the district court, is sufficient to prove the point. Bradley v. School Board of City of Richmond, Virginia, 53 F.R.D. 28, 29–33 (E.D.Va. 1971).

## II.

I turn to the more important questions of the scope and application of § 718. Neither in the instant case, nor in James v. The Beaufort County Board of Education, 472 F.2d 177 (4 Cir. decided simultaneously herewith), does the majority articulate in other than summary form why § 718 should not apply to cases pending on its effective date (July 1, 1972). I conclude that it does apply, and in the face of the majority's silence, I must discuss the pertinent authorities at some length.

The text of § 718 is set forth in the margin.[1] Its enactment presents no question of retroactive application to this litigation. As I shall show, the issue of the allowance of counsel fees has been an issue throughout every stage of the proceedings; and the proceedings were not terminated when § 718 became effective on July 1, 1972, because this appeal was pending before us. This is not a case where a subsequent statute is sought to be applied to events long past and to issues long finally decided. Rather, it is a case which presents the concurrent application of a statute to an issue still in the process of litigation at the time of its enactment. United States v. Schooner Peggy, 1 Cranch 103, 2 L.Ed. 49 (1801), and Thorpe v. Housing Authority of Durham, 393 U.S. 268, 89 S. Ct. 518, 21 L.Ed.2d 474 (1969), are the significant controlling authorities.

In *Peggy,* while an appeal was pending from a decision of the lower court in a prize case, the United States entered into a treaty with France, which if applicable would have required reversal. The treaty explicitly contemplated that it would be applicable to seizures that had taken place prior to the treaty's ratification where litigation had not been terminated prior to ratification. On the basis of the new treaty, the Supreme Court reversed the decision of the lower court. In the opinion of Mr. Justice Marshall, it was said:

> It is in the general true that the province of an appellate court is only to inquire whether a judgment when rendered was erroneous or not. But if, subsequent to the judgment, and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. If the law be constitutional, . . . I know of no court which can contest its obligation. It is true that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights of parties, but in great national concerns, where individual rights, acquired by war, are sacrificed for national purposes, the contract making the sacrifice ought always to receive a construction conforming to its manifest import; and if the nation has given up the vested rights of its citizens, it is not for the court, but for the government, to consider whether it be a case proper for

---

1.    *Attorney Fees*

Sec. 718.    Upon the entry of a final order by a court of the United States against a local educational agency, a State (or any agency thereof), or the United States (or any agency thereof), for failure to comply with any provision of this title or for discrimination on the basis of race, color, or national origin in violation of title VI of the Civil Rights Act of 1964, or the fourteenth amendment to the Constitution of the United States as they pertain to elementary and secondary education, the court, in its discretion, upon a finding that the proceedings were necessary to bring about compliance, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

compensation. In such a case the court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside.

United States v. Schooner Peggy, supra, 1 Cranch at 109.

*Peggy* may be interpreted in two ways: Under a narrow interpretation the Court held only that, where the law changes between the decision of the lower court and an appeal, the appellate court must apply the new law if, by its terms, it purports to be applicable to pending cases. The decisional process, under this interpretation, requires the appellate court to examine the intervening law and to determine whether it was intended to apply to factual situations which transpired prior to the law's enactment. Since the treaty in *Peggy* explicitly applied to situations where the controversy was still pending, it followed that the statute should be applied in deciding the case. Certainly the facts of *Peggy* and much of the language of the opinion of Mr. Justice Marshall support this interpretation.

By a broader interpretation, *Peggy* may be considered to hold that where the law has changed between the occurrence of the facts in issue and the decision of the appellate court and where the controversy is still pending, the appellate court must apply the new law, unless there is a positive expression that the new law is not to apply to pending cases. This is the interpretation of *Peggy* which found its final expression in *Thorpe.* But before turning to *Thorpe* it is well to consider intervening decisions.

In Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327 (1941), the Court held that a federal appellate court in exercising diversity jurisdiction must follow a state court decision which was subsequent to and contradicted the district court decision. In Carpenter v. Wabash Ry. Co., 309 U.S. 23, 60 S.Ct. 416, 84 L.Ed. 558 (1940), the Court held that the appellate court must apply an intervening federal statute where the case is pending on appeal. However, in *Carpenter,* the statute explicitly indicated that it was to apply to pending cases. In United States v. Chambers, 291 U.S. 217, 54 S.Ct. 434, 78 L.Ed. 763 (1934), the Court held that indictments returned pursuant to the eighteenth amendment, and before the adoption of the twenty-first amendment, must be dismissed after passage of the twenty-first amendment even though the acts when committed were crimes. See also Ziffrin v. United States, 318 U.S. 73, 63 S.Ct. 465, 87 L.Ed. 621 (1943). Then, in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the Court drew a firm distinction between those cases where an appeal is still pending and those that are final ("where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed . . .," 381 U.S. at 622, n. 5, 85 S.Ct. at 1734). The Court held that Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), applied to pending cases but not to final cases. It discussed the previous decisions to which reference has been made and concluded that "[u]nder our cases . . . a change in law will be given effect while a case is on direct review . . .." 381 U.S. at 627, 85 S.Ct. at 1736. It should be noted, however, that the Court was by no means consistent in applying this rule after *Linkletter.* See Desist v. United States, 394 U.S. 244, 256–260, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting).

In *Thorpe,* the Housing Authority gave the tenant notice to vacate in August, 1965, but refused to give its reasons for the notice. When the tenant refused to vacate, the Authority brought an action for summary eviction in September, 1965, and prevailed. Actual eviction, however, was stayed during the pendency of the litigation. In 1967, before the Supreme Court decided the case, the Department of Hous-

ing and Urban Development issued a circular directing that tenants must be given reasons for their eviction. The Supreme Court held that housing authorities must apply the HUD circular "before evicting any tenant still residing in such projects on the date of this decision." 393 U.S. at 274, 89 S.Ct. at 522. Relying on *Peggy*, it explained that "[t]he general rule . . . is that an appellate court must apply the law in effect at the time it renders its decision," although it recognized that "[e]xceptions have been made to prevent manifest injustice . . . ." 393 U.S. at 281–282, 89 S.Ct. at 526.

The difference between *Thorpe* and *Peggy* is that the HUD circular did not indicate that it was to be applied to pending cases or to facts which had transpired prior to its issuance. Indeed, the circular stated that it was to apply "from this date" (the date of issuance). 393 U.S. at 272, n. 8, 89 S.Ct. 518. Thus, *Thorpe* held that even where the intervening law does not explicitly or implicitly contemplate that it would be applied to pending cases, it, nevertheless, must be applied at the appellate level to decide the case. The line of cases from *Peggy* to *Thorpe* dictates the application of § 718 in the instant case, irrespective of legislative intent. Simply stated, since the law changed while the case (the lawyers' fees issue) was still pending before us, the new law applies.

The School Board contends that *Thorpe* does not erase the long-standing rule of construction favoring prospective application. It argues that *Thorpe* did not present a retroactivity question since the tenant had not yet been evicted. It places great reliance on the "tenant still residing" language in the opinion. The School Board concludes that since the tenant had not yet been evicted, the HUD circular was not retroactively applied but was currently applied to a still pending eviction. With respect to the legal services in issue in the instant case, the Board argues that the *Thorpe* rule does not apply since the performance of legal services was a completed act prior to the effective date of § 718.

While the Board's premise regarding the interpretation of *Thorpe* may not be faulted, its analogy is inapt and its conclusion incorrect. True, the rendition of legal services in the instant case had been completed (except for legal services on appeal), but the dispute over who was liable for payment was very much alive, as alive as the dispute over eviction in *Thorpe*. The proper analogy is not between rendition of legal services and the eviction litigation, but between rendition of legal services and the Housing Authority's termination of the lease and notice to vacate. These are the completed acts. What lingers is the dispute over who is right, and it lingers in both cases. Therefore, as in *Thorpe*, here there is no retroactivity issue. *Thorpe* governs and § 718 applies unless it is rendered inapplicable because one or more of its provisions has not been met. See Bassett v. Atlanta Independent School Dist. No. 1550, 347 F.Supp. 1191 (E.D.Tex.1972).[2]

---

2. It must be recognized that there are some discordant notes in the case law: In Soria v. Oxnard School Dist. Board, 467 F.2d 59 (9 Cir. 1972), it was held, in a per curiam opinion, that § 803 of the Education Amendments of 1972, which postponed the effectiveness of busing orders for the purpose of achieving racial balance until all appeals have been exhausted, had no application to a case pending at the time of its effective date in which busing, pursuant to an integration plan, is already in operation. There is no mention, however, of *Thorpe*.

In Greene v. United States, 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964),

the Court refused to apply an intervening Department of Defense regulation to a pending case, reasoning in retroactivity language. But this case was obviously one where "retroactivity" would work "manifest injustice." See *Thorpe*, supra at 282 n. 43, of 393 U.S., 89 S.Ct. 518. Cases construing the Criminal Justice Act, 18 U.S.C.A. § 3006A (1970), which provides court-appointed attorneys with fees from federal funds have held that it applies only where counsel was appointed after the Act, or at least, only where counsel's assistance was rendered after the Act. Compare United States v. Pope, 251 F.Supp. 331 (D.Neb.1966) with United

### III.

Since *Thorpe* governs, legislative history is not relevant, unless it unequivocally shows an intention on the part of Congress that the statute not apply to live issues in currently pending cases. The legislative history of § 718 provides no such expression of intent. To the extent that it proves anything, it supports the conclusion that § 718 should apply to live issues in currently pending cases.

Two clauses of § 718 bear on the issue. As originally proposed and reported, § 718 provided for a federal fund of $15 million from which counsel would be paid "for services rendered, and the costs incurred, after the date of enactment . . . ." S. 683, § 11 (Quality Integrated Education Act). The Senate Committee on Labor and Public Welfare reported the bill, with this clause intact, as S. 1557. Sen.Rep.No.92–61. 92nd Cong. 1st Sess. pp. 55–56.

The School Board places great stress on this language as indicating a strictly prospective legislative intent. It fails to point out, however, that the federal funding, as well as the "after the date" clause, were deleted by floor amendment prior to the passage of the Act. This floor amendment can be construed to indicate that Congress' ultimate intent was indeed the opposite of that urged by the Board. The "after the date" clause and federal funding seem to have gone in tandem. Given the nature of federal appropriation, prospective application would be a sensible requirement. Compare Criminal Justice Act, 18 U.S.C.A. § 3006A (1970). By the deletion of federal funding, the reason for restricting payment of attorneys' fees for services performed after the date of enactment disappeared.

Secondly, the School Board points to the language in the committee report which refers to "additional efforts," but the sentence is phrased in the conjunctive. It reads: "$15 million is set aside *for additional efforts* under this bill and under Title 1 of the Elementary and Secondary Education Act of 1965 * * * *and for* vigorous nation-wide enforcement of constitutional and statutory protection against all forms of discrimination" (emphasis added). Whether "additional efforts" modifies everything that follows, or just what precedes the conjunction "and", is debatable and a rather unenlightening inquiry.

Thus, nothing on the face of § 718, or in its legislative history, conclusively manifests a congressional desire that the *Thorpe* rule applying new legislation to live issues in pending litigation should not prevail. I turn to the question of its precise application.

### IV.

Section 718 empowers the court to award counsel fees "in its discretion, upon a finding that the proceedings were necessary to bring about compliance . . . ." The private attorney general rule of Newman v. Piggie Park Enterprises, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968), governs the court's discretion. Under the *Piggie Park* standard, the court should award counsel fees "unless special circumstances would render such an award unjust." 390 U.S. at 402, 88 S.Ct. at 966. See Lea v. Cone Mills Corp., 438 F.2d 86 (4 Cir. 1971). The language of § 718 is substantially similar to the counsel fee provisions in § 204(b) of Title II and § 706(k) of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000a–3(b), 2000e–5(k), and § 812(c) of Title VIII of the Civil Rights

States v. Dutsch, 357 F.2d 331 (4 Cir. 1966) ; United States v. Thompson, 356 F.2d 216 (2 Cir. 1965) cert. den. 384 U.S. 964, 86 S.Ct. 1591, 16 L.Ed.2d 675 (1966) ; Dolan v. United States, 351 F.2d 671 (5 Cir. 1965) (per curiam). But that Act involved expenditures of federal appropriations which, by the terms of the Act, would not become effective until a year after enactment, so that it may be fairly said that there was a clear legislative intention not to make the terms of the Act applicable to pending cases.

Act of 1968, 42 U.S.C.A. § 3612(c), all of which are governed by *Piggie Park*. Moreover, the legislative history of § 718 reveals that its purpose is the same as the counsel fee provisions in Titles II, VII, and VIII. 117 Cong.Rec.S. 5484, 5490 (Daily Ed. April 22, 1921); *id*. S. 5537 (Daily Ed. April 23, 1971). The additional standard in § 718 requiring the court to find that the suit was necessary to bring about compliance does not modify the *Piggie Park* standard, because its purpose, as revealed by the legislative history, is to deter champertous claims and the unnecessary protraction of litigation. 117 Cong.Rec.S. 5485, 5490–91 (Daily Ed. April 22, 1971). In the instant case, the district court found that suit was necessary to bring about compliance and it also found, at least implicitly, that there were no exceptional circumstances which would render an award of counsel fees against the School Board unjust. These findings are not clearly erroneous and hence counsel are entitled to some allowance of fees under § 718 as construed by *Piggie Park*.

### V.

Although § 718 should be applied to legal services, whenever rendered, in connection with school litigation culminating in an order entered after its effective date (July 1, 1972), § 718 will not support affirmance of the precise award made by the district court in this case. It would, however, support a larger award to compensate for legal services rendered over a longer period.

The district court's award was for legal services rendered from March 10, 1970, the date when plaintiff filed a motion for further relief because of the decisions in *New Kent County*, supra, *Alexander*, supra, and *Carter*, supra, to January 29, 1971, the date on which the district court declined to implement plaintiff's plan. Manifestly, the entry of that order cannot support an award of counsel fees for services to the date of its entry because the order did not grant relief to the parties seeking to recover fees—a condition precedent to the award of fees as set forth in § 718. But, a recitation of the history of the litigation shows that counsel fees should be awarded for all legal services rendered from March 10, 1970 to April 5, 1971, the date on which the district court entered an order approving the plan under which the Richmond schools are presently being operated, and thereafter for legal services rendered in this appeal.

The essential dates in the history of the litigation follow: The motion for further relief was filed March 10, 1970. Appended thereto was an application for an award of reasonable attorneys' fees. After admitting that its schools were not then being constitutionally operated, the Board filed a plan (Plan 1) to bring the operation of the schools into compliance with the Constitution. After hearings, the district court disapproved Plan 1 (June 26, 1970) and directed the preparation and filing of a new plan. Plan 2 was filed July 23, 1970, and hearings were held on it. It, too, was disapproved as an inadequate long-range solution. But, because there was insufficient time to prepare, file and consider another plan before the beginning of the next school term, Plan 2 was ordered into effect on August 17, 1970, for the term commencing August 30, 1970, and the Board was also ordered to make a new submission. The Board appealed from the order implementing Plan 2 and obtained a delay in briefing from this court. The appeal was never heard, because, having been effectively stayed, it was rendered moot by later orders. Before Plan 3 was filed, plaintiffs sought further relief for the second semester of the 1970–71 school year, but Plan 3 was filed (January 15, 1971) before they could be heard and their motion was denied on January 29, 1971, the terminal date for the allowance of compensation in the order appealed from. Plan 3 contained three parts—it was a restatement of Plans 1 and 2, and it contained a new third proposal. The Board urged the adoption of the Plan 2 aspect of Plan 3; but, on April 5, 1971, the district court ordered into effect for the 1971–72

school year the new third proposal. This is the plan under which the Richmond schools are presently operating.[3]

To this summary there need only be added that on August 17, 1970, the district court ordered the parties to confer on the subject of counsel fees. Plaintiffs filed on March 5, 1971, a memorandum in support of their request for an allowance; the court, on March 10, 1971, ordered that further memoranda and evidentiary materials with regard to the motion for counsel fees be filed; and these were filed on March 15, 1971. The order directing the payment of counsel fees was entered May 26, 1971, after the entry of the order approving and implementing Plan 3.

The majority concludes that § 718 was rendered inapplicable because the order appealed from was entered May 26, 1971, a date on which there was no "final order" entered as "necessary to secure compliance." This conclusion seems to me to be overly technical and not in accord with the facts.

The request for counsel fees was made when the motion for additional relief was filed on March 10, 1970. While very much alive throughout the proceedings, properly, the motion was not considered until the district court could approve a plan for a unitary system of schools for Richmond which was other than an interim plan. That approval was forthcoming on April 5, 1971, and promptly thereafter the district court addressed itself to the question of allowance of counsel fees. The approval of a permanent plan was not easily arrived at. Because the proposals of the Richmond School Board were constitutionally unacceptable, except on an interim basis, this approval was arrived at in several steps: (a) disapproval of Plan 1, (b) interim approval of Plan 2, (c) disapproval of additional interim relief, and (d) approval of Plan 3.

Certainly, § 718 is not to be so strictly construed that any counsel fees allowable thereunder must be allowed the very instant that an order granting interim or permanent relief is entered. A request for fees may present difficult questions of fact and require the taking of evidence. The burden of deciding these questions should not be added to the simultaneous burden of deciding the often very complex question of what is a constitutionally acceptable desegregation plan; rather, the issues should be severed and the question of counsel fees decided later so long as the issue of counsel fees had been present throughout the litigation and has not been raised as an afterthought after the school desegregation plan has become final. These practical considerations, plus the fact that every stage in the proceedings has been a part of an overall transition from unconstitutionally operated schools in Richmond to constitutionally operated schools, lead me to the conclusion that the exact terms and conditions of § 718 have in the main been met.

While I therefore conclude that there was a sufficient nexus between the request for counsel fees and the entry of a final order necessary to obtain compliance with the Constitution so as to warrant invoking § 718, I think that § 718 requires that the district court redetermine the allowance. As previously stated, the district court made an allowance for services to the date that plaintiffs' request for additional interim relief was denied. If the various steps for arriving at an overall desegregation plan for Richmond are severed, § 718 would not permit an allowance for services leading to the order of January 29, 1971, since on that date plaintiffs were denied the additional interim relief they prayed and § 718 permits an allowance only to the prevailing party. However, plaintiffs would be entitled to an allow-

---

. 3. Of course there were even still further proceedings culminating in an order to consolidate the Richmond, Henrico County and Chesterfield School Districts, but this court set that order aside in Brad-

ley v. The School Board of City of Richmond, Virginia, 462 F.2d 1058 (4 Cir. 1972), application for cert. filed October 10, 1972.

ance for services beyond January 29, 1971, up to April 5, 1971, the date of approval of Plan 3, because on that date they became the prevailing party and they obtained an order, still in effect, which required the schools of Richmond to be operated agreeably to the Constitution. I would therefore vacate the judgment and remand the case for a redetermination of the amount of the allowance —in short, I would require that counsel be compensated for their services to and including April 5, 1971 and also their services on appeal in this case.